Chief No. 18-1018 et al., North Carolina Utilities Commission, Petitioner v. Federal Energy Report Commission, Mr. Brewer, Petitioner, Mr. McNamara, the Engineer at New York PSC, Mr. Castellas, the Respondent, and Mr. Suarez, the Engineer, and so on. Thank you. Good morning. May it please the Court. I'm Kathleen Reserve, the firm of Duncan and Allen, arguing today on behalf of the North Carolina Utilities Commission. That's the state agency charged under Chapter 62 of the North Carolina Code to protect the interests of North Carolina ratepayers before federal agencies and the Court to ensure adequate, reliable, and economical utility service to all citizens and residents of North Carolina. How do we know that this case is going to affect any North Carolina ratepayers? Well, let's consider the Atlantic Sunrise Project. That project is mostly contracted by producers and marketers. FERC did not require that any shippers be end users when it certificated that proceeding, those facilities. However, it did find that marketers and producers would use the capacity under that project to deliver gas to the Mid-Atlantic and Southeastern markets. That's in the Joint Appendix of 296. Given the gas flows from Pennsylvania to Mississippi on that project, and there were facilities constructed in North Carolina for that project, Transco actually marketed the project as having primary and secondary rights within the contract path, and that path goes from Pennsylvania to Mississippi. North Carolina is squarely in the market where the marketers and producers who have signed up for that capacity will be delivering the gas. It's in the market, but I guess that still doesn't answer the question as far as how do we know that gas will be delivered in North Carolina to North Carolina rate payers without making some assumptions. Well, in the case of the Cancel Corporation Commission v. FERC case, it wasn't that you had to demonstrate a certainty, rather a substantial probability. And here, given that the gas will be delivered within the Southeast and Mid-Atlantic markets, those are the facts that FERC relied on in issuing the certificate. We believe that the substantial probability has been met. Do you believe that the special solicitude granted in Massachusetts v. EPA is necessary for you to establish standing? No. We believe that we have met the wrong factors. Based on substantial probability. But substantial probability. Also, unlike in the Cancel Corporation Commission opinion, here there is more than a mere possibility of collateral or causal effect. As demonstrated by page 3 of the addendum to the North Carolina Utilities Commission Refinery, Transco is already claiming in other proceedings that the North Carolina Utilities Commission is collaterally stopped from raising the arguments it's making here when challenging new projects that Transco is proposing to construct. What about redressability? Why is, even if we were to assume that there's injury here, and assume that you were to prevail on the merits, as far as your argument about the improper recourse rate, how is that redressable of the injury? Well, FERC obviously has significant discretion in how it chooses to fulfill its obligations under the Natural Gas Act. However, below, the State Commission requested that FERC hold an evidentiary hearing in order to explore whether or not the recourse rate provided the necessary check on the exercise of market power by the pipeline at the time they were entering into the negotiated rate. Unfortunately, FERC exercised its discretion and chose not to do so. However, FERC has, in other proceedings, performed DCS analysis under Section 7 proceedings without holding an evidentiary hearing. But here, FERC decided to, it directed that the issue be addressed in Transco's next rate case. Those negotiated rate agreements are not at issue in that case. Therefore, the remedy that FERC directed below simply is illusory. We believe that this Court has, since FERC claims that, in the orders below, they satisfy the negotiated rate policy and the necessary check on the potential market power was provided here, that's at page 20 of FERC's brief, we believe that this Court has the authority to remand and require that FERC actually apply its policies and determine whether or not that appropriate check... Why do we think that if that happened, that the rate paid would be any different? I mean, everyone here is here under a negotiated rate, right? Correct. And so, and it was a negotiated rate that was entered into before FERC set the recourse rate, right? Correct. So, we would have to think that if you were to prevail here, that some, what, go back to new negotiations that would end up with a new negotiated rate? That is one possibility. Unfortunately, FERC never actually looked at the negotiated rates. It simply assumed that the market power was checked. Unfortunately... What I'm interested in is whether the end result would be any different. Would there be different negotiated rates if there were a different recourse rate set? And what's the evidence for that? Well, the recourse rate, FERC's policy is that the recourse rate must be available at the time the negotiated rates were entered into. And they had a recourse rate at the time. Well, they had a recourse rate... They had a policy as to what the recourse rate would be, right? And FERC blindly applied one policy. It's a policy of using the most recent stated rate, which is a policy which helps administrative expediency. But it allowed that policy to trump its more fundamental obligation of protecting against... What I'm getting at is, did that change the negotiated rate in any way? Well, FERC relied on those negotiated rates and assumed that they were free of the exercise of market power. When it relied upon those negotiated rates it issued the certificates for billions of dollars of new facilities. Unfortunately, as the Missouri Public Service Commission case guides us, before FERC can rely on existing contracts between the pipeline and customers to show that rates are reasonable, FERC must first determine, upon the basis of substantial evidence, that the pipeline lacks significant market power. Let me ask you. Maybe you can educate me about how these contracts go. As I understand it, these rates were negotiated in 2014, 2015. Right. And at that time, FERC had not yet set a recourse rate, right? The pipeline proposed a recourse rate, though they're all set forth in Appendix P of each of the applications. Right. Okay, so at the time there's a proposed recourse rate, but not a set recourse rate. When parties enter into negotiations in those circumstances, do they say, if FERC comes up with a different recourse rate than the proposed one, we're back at the table and we're going to negotiate all over again? Is that part of the negotiation? It could be. Was it here? I do not know. Yeah, no one has said that, so why? Did the shippers make a counterproposal? We're not part of the negotiation. Isn't it the case that the policy of FERC is the last recourse rate is the recourse rate? Actually, it's policy is that the last stated return, no matter how old, it has two policies. I understand. So when Judge Griffith is asking what was the likely recourse rate at the time of the negotiation, it was the one dictated by the policy. Now, I understand you think that's wrong, but the people who are negotiating would have nothing other than a high recourse rate because that was the rate assumed at the time. That is one of FERC's policies. The problem is FERC could not apply its alternative rate policy statement, which requires that the recourse rate not be stale or outmoded. I'm sorry. I think you're thinking that I'm asking a question that's going to hurt you. Also, I think I'm asking a question that was intended to help your argument. The question is, was there a recourse rate, a likely recourse rate at the time of the negotiation, and wouldn't all parties have expected, unless you were able to persuade FERC later otherwise, that the recourse rate at that time was the last recourse rate, which was a high one? It was actually the last stated return figure. The return figure is the largest element of the cost of service that results in the recourse rate. I understand. That's the one that you think is wrong. And we think it's inconsistent with FERC policy. That's the one that was at the time, unless you were to succeed later in this proceeding, that would be the one that would be the rate of return. But FERC's policy requires that that recourse rate not be stale or outmoded. I don't think you understand my question. But let me ask you another question. In your opening brief, you asked for vacatur. Yes. In your reply brief, you asked for remand. Have you lost your nerve in between those two? Or what's the deal? Well, Your Honor, we would be happy with either. We do believe that FERC should be required to apply both of its policies, and that the policy of the last stated rate, which- Is there a reason for asking for remand rather than vacatur in the reply brief? I mean, are you concerned about disruption and that sort of thing? Imprecision, Your Honor. My apologies. Imprecision. Oh, it's only imprecision. My apologies. So if we rule for you, what happens next to change the rate that consumers would ultimately pay? Just walk me through that. Well, that would be up to FERC, and FERC certainly has a lot of deference in deciding how it would determine whether or not the recourse rates were free of the exercise of market power. But also, this is something that comes up a lot. We have already carried within other states as well. Okay, so let's imagine FERC in the next step, FERC accepts your recourse rate, your argument. What happens then? Do the parties actually renegotiate? I'm unaware of that having occurred up to this point. I think that would be new ground for FERC to figure out how it would fix this error. Okay, thank you. We'll hear from New York. Good morning, Your Honor. May I please record Lucas McNamara on behalf of the New York State Public Service Commission? Mr. McNamara, in reading your brief, I read a somewhat different explanation of redressability than is provided by North Carolina. Do you want to explain what your explanation is? Sure. So, we believe that in granting the certificate with the conditions, FERC has altered our ability to meaningfully challenge the negotiated agreements with the negotiated rates. And we believe that's how we establish traceability and redressability. So, as I understood, the redressability point is,  if you're correct on the merits, then we vacate the certificate of convenience and necessity and the pipeline cannot go forward unless something else happens. And the rate cannot go forward because the rate was to, the agreements provide that the rate doesn't go forward until there is a certificate of need and necessity, convenience and necessity. And FERC has the authority under Section 7 to set conditions. And if you are right, the appropriate condition is, here's the new recourse rate, go negotiate another deal. We think that's right. It may take another step. Okay, but this would make it redressable. If you are right on the merits, we have the power, you may not win, but if you did win, we have the power to vacate the current agreement with respect to rates and direct FERC or on reamend let FERC make its own decision to set a new recourse rate and a new negotiation. Is that right? Yes. And I would point to FERC's August 16th determination. Well, first of all, I would point out that before this Court, FERC is saying that the proper time to challenge the negotiated agreements and negotiated rates is when there's I have another question, and I think we should discuss that also. But right now we're on the standing question. And with respect to the questions that Judge Griffith was asking your co-counsel, how is it that why isn't it the fact that since they just negotiated a rate, that's the end of it? They didn't pick the recourse rate, and so it's tough luck. But since they didn't pick the recourse rate and they negotiated the rate, that should be the end of the matter. What was your answer to that? The answer to that is that they knew what the recourse rate would be because FERC has said that it would consistently apply its policy. So the shippers would have known that in such a circumstance that it would consistently apply its policy despite the fact that doing so in these circumstances where it would draw on a 15-year-old data would be irrational and arbitrary. And it would not constrain the monopoly power, the market power, which is the whole point of the policy of FERC. Yes. FERC's recourse rate policy establishes this. In fact, they say that their recourse rate policy needs to retain integrity to properly serve as a check on market power. So we're not relying on anything that FERC hasn't said on this issue. Now would you answer Judge Wilkins' questions to your co-counsel about why New York consumers will be affected by this or at least there's a substantial probability? Sure. So we focused on injury in fact in terms of the Atlantic Sunrise Project. And the quick answer on this is TRANSO's promotional materials support our contention. Their promotional materials in the record at 282 advertise the Atlantic Sunrise Project as providing access to the New York City markets. In our initial brief to this court, we submitted an affidavit from Cynthia McCarran explaining how shippers are able to access the New York City market. The New York City market is the largest market on the TRANSO pipeline. We believe that we have established more than the substantial probability necessary for injury. In fact, particularly giving again that TRANSO's position, you know, a willingness position in terms of how they were advertising this pipeline is that the reason you want to subscribe to this pipeline is it will allow you access to the New York City market. Was that in your opening brief or in your reply brief? So the evidentiary materials are in the administrative record. I don't know whether we cited the promotional materials, but the reason that we – if we did not cite the promotional materials in our opening brief, we did so in rebuttal when FERC suggested that the only way that the – and we submitted an affidavit explaining why that is not in fact the case, you know, and outlining how secondary rights work, secondary pathways, and pointed to the fact that TRANSO agreed with that argument essentially. At the time where they were not involved in advocacy, they took the position that the New York City market was why you would want to subscribe to the Atlantic Sunrise Project expansion. Thank you. If we were to get to the merits, why was – why would you be able to prevail under the arbitrary, capricious standard where – I don't think that there's any dispute in the record that the most recent data available was used, right, as far as an actual pre-tax rate of return? Sure. So, I mean, FERC can't inhibit data. It can't get blood out of the stone. So what is – what was arbitrary and capricious about what they did? Okay, so a couple points. Quickly, I'm just going to start with the end of your question. FERC could have done anything that was rational to figure out a proper cost of service calculation. So we don't necessarily need to recommend something specifically or dictate that there's only one course that could have held an evidentiary. And – I'm sorry, I'm forgetting the beginning of your question now. But you do have to show that this was irrational. Yes, yes, we do. So it's irrational because it violates FERC's own policies. And the most – the two policies that it most directly violates is that FERC has a policy and practice of rejecting stale and outmoded data as inappropriate for establishing cost of service. That's the Cranberry Pipeline FERC case that we cited in our brief. This court in Farmers Union v. FERC has noted that cost of service data from a previous case is our product of a bygone era. I believe that's the quote. So this is a principle that this court has recognized.  So classically arbitrary administrative action is adopting a policy and then contravening that policy without explanation. So there is no explanation. FERC simply never engaged – How long does the process get slowed down if they do that? I mean, what they're arguing is that we have this data. Let's press ahead. If we stop to have an evidentiary hearing, the thing gets delayed by a significant amount of time. How do you respond to that? Sure, well, I'm not sure I can answer for FERC on that. But we certainly believe that if these needed to be expedited, that New York would participate in that expedited proceeding. There's questions about would it have to be the full-blown – we're not talking necessarily about a full-blown Article Section 4 proceeding here. So, again, in some ways that we recognize that that's a question that's within FERC's purview in terms of it coming up with a rational solution. But the problem with their current solution is that that explanation is tantamount to saying we do not have a consumer protection obligation to protect consumers from market power in Section 7 proceedings. And that is inconsistent with the precedent from this court, from the United States Supreme Court, out of the Missouri Public Service Commission, and FERC in 2003 for setting forth principles that establish that cost is relevant in terms of the consumer protection obligation in Section 7 proceedings. So, it's no answer to focus on the need for plentiful supply and administrative convenience, if your argument is, and because of that, that statutory obligation that we have, we're not going to fulfill it. That's patently irrational. I interrupted you when you were – we'll give you some more time. I interrupted you when you were going to explain why FERC's suggestion of the Section 4 proceeding – I'm not particularly interested in the August 31 one, because I understand that that – well, let me just ask. That one would not apply to help you at all, right? That only would apply to the next Section 7 case. I was referring to the August 16th determination. That's the one I wanted to ask. Yes. So, what's wrong with that? Okay. So, what's interesting about that is it supports our point. Transco submitted it and said, FERC has consistently said wait for the negotiated agreement submission process. That's when it's appropriate to do that. But when FERC was accepting the agreements for the Atlantic Sunrise Project, a close reading shows that it did not, in fact, say that this was the appropriate time. In Paragraph 16, FERC explained that essentially that it was too late to provide such consideration. So, Paragraph 16, it says that Transco has relied – Do you want to go to the next page? So, that was submitted – I'm sorry. That was submitted pursuant to Rule 28J by Transco. Are you talking about the Atlantic Sunrise order or the August 16th order? The August 16th decision. Okay. So, that says, in Paragraph 10, the proper form for a protest and negotiated rate is at the time the pipeline files a relevant contract or tariff records containing the essential details of the agreement. And that would be fine or at least would support that point that FERC is making if it then treated that as though it was the case. But if you read Paragraph 16, what it says is that Transco relied on its granting of the certificate and that therefore it is, quote, reluctant to upset, end quote, that reliance. So, if FERC is saying that it is reluctant to upset Transco's reliance based on the decision – So, maybe this is wrong and you're going to appeal that one. I mean, why isn't that the appeal rather than this one? That's certainly a possibility, but at this point, FERC is taking the position that there is some sort of tacit approval at the certificate stage that is meaningfully changing our rights in terms of our ability to challenge a negotiated rate. And that explains why FERC is saying this is way too – when the agreements are submitted, they're saying this is way too late. We've encouraged, you know, billions of dollars in investment. We can't seriously consider this issue anymore. And there's some, you know, that would in some ways fit with FERC's practice of promoting shippers or promoting pipeline companies to come into Section 7 proceedings having fully subscribed their pipeline. So, they're encouraging that policy, but then they're saying, but we're not passing on whether those agreements are valid in any way. And so, we have reason – I think there's reasons to believe that FERC is actually making determinations in the certificate proceeding at least on a preliminary basis about the negotiated agreements. And if that's the case and our ability to challenge those negotiated agreements is harmed at the certificate stage, then we are injured and that injury is redressable by FERC's determination to establish an initial recourse rate that was arbitrarily relied on 15-year-old data. You know, FERC does not say 15-year-old data is okay to rely on because. That is simply not a sentence that's in FERC's determination. And simply saying we have consistently applied this policy is also not a rational explanation because there's always a question before you apply the policy of whether it is rational in the circumstances to use the policy. And that is the issue in this case. Thank you, Your Honors. Good morning, Your Honors. My name is Beth Purcell with FERC and with me at counsel's table is Andy Swerves, who represents TRAMSO. Let me just – I'm going to start with standing, of course, but I just want to point out one thing. You know, as the Court recognizes, negotiated rates were not approved here. The Commission did not rely on the existence of nonexistent negotiated rates when it made its certificate determinations. It relied on the existence of precedent agreements, which are wholly different. The Commission does not know what the rate is at the time that that is disclosed at the negotiated rate time, which is, in Atlantic Sunrise, was responded to by the Commission in this order that we were just talking about this August. I'm not sure of the meaning of this. Are you saying that the appropriate time is this August? Absolutely, Your Honor. So, FERC's position is it's okay to wait to approve negotiated rates after the certificate is already done, after the pipeline is already ready to flow? Because that rate can be changed. Yes, the rate can be changed, but opposing counsel's point is he thought that FERC wanted to make sure that the pipeline could have a reasonable economic decision in building the pipeline. And if the rate changes, it's no longer necessarily a reasonable economic decision. So, doesn't everybody benefit by doing it at the time of the Section 7 proceeding? No, no, no, no, Your Honor. For sure, what would happen here, and again, what's before the Court is this specific circumstance here, and I'm kind of on the merits now, and I'm happy to talk about that. I don't want to be on the merits. I mean, the first question is, are we appealing in the right place? It is not an appeal in the correct place, because really, it turns out, based on their reply brief, not on their opening brief, where they really only talked about the recourse rate, and now they're talking more about the negotiated rate, and they've kind of shifted their argument. But if they're concerned... I don't think, to be clear, I don't think that's fair. I think the theory of FERC is that the recourse rate affects the negotiated rate. Is that not true? That the recourse rate affects... The resulting negotiated rate. For sure, when the parties enter into these contracts, they know, and that's why... They know what the recourse rate is? They don't know what the recourse rate is, but they know the Commission's general policy. That's right. So, they should assume that that policy is going to continue. Sure. And negotiate in the shadow of that recourse rate. Of course. And that's the theory, which that is what protects against the market power of the pipeline... That's right. ...in a situation where the pipeline has market power, which I take it is this case. And in this specific circumstance here, which is all that I'm defending today, the orders here, the three sets of orders I'm challenged here, the Commission pointed out why it's appropriate to apply its general policy, is because there is a Section 4 proceeding that had to be filed in August, by August 31, 2018. So, while the parties would be agreeing, the shippers would be agreeing to negotiate... Whoa, whoa, whoa. That's not the negotiated rate filing. That's the... No, that's the Section 4 general rate filing. And that rate would not apply to these people. If they didn't like the... I know the theory. Your Honor... Because it only goes to the next section. And when they're making their determination whether to negotiate with TRANSCO or to take the recourse rate, that is something that they knew. So, they knew they had... It wouldn't apply to... If a Section 7 proceeding happens before this August 31st general rate proceeding, only applies to the next pipeline construction. It doesn't apply to this one, does it? It doesn't because they chose in that factual circumstance to take the negotiated rate, but they could have taken the recourse rate. They could have taken an unknown future recourse rate, is that what you're saying? Sure. That happens all the time. And in the circumstance where they know... I just want to be sure I understand the facts. Sure. So, they don't take the recourse rate that's there, which is the only one they actually know. They know what the policy was before. They don't know what the new one will be. Yes. But you're saying if a new one is provided in the Section 4 rate case, that one... They can now pick that one up? Not now, but at the time. That's what I'm saying. Or the Commission's basis for why it was... Please, Susan. I'm sorry. I don't know the FERC stuff quite as well as you do, so you'll have to help me with this. Sure. They could have said, we will take the recourse rate. Right. They won't know what it is. Right. And if in August it's set lower than the one that is under your policy, they would get that one... Absolutely. ...for the future of this pipeline. Exactly. And they would have as much... Notwithstanding the fact that other people would have already filled up the entire pipeline, produce, they would still be able to get... No, because when they decide whether to do a precedent agreement with Transco, the shippers have a choice at that time. We are going to take the recourse rate that's set in the Section 7 proceeding, and in this circumstance we'll be subject to change in the Section 4 proceeding happening shortly thereafter, or we can take a negotiated rate. They had that full choice then. Transco didn't have any ability to say to them, no, you have to take a negotiated rate. That's the basis of the Commission's policy. In order for the recourse rate to be leveraged against the market power of the pipeline, don't you have to know what the recourse rate is? No, Your Honor. You have to know that the recourse rate will apply and that it can then be, even if in Section 7 it is not a just and reasonable rate, it's only a public interest rate, that that can then, you can either go through Section 5 or here through a Section 5 complaint. Of course, Section 5 puts the burden the other way. Right, and so that's why in this circumstance here, Your Honor, Section 4 was already going to happen for sure. A hundred percent chance that by August 31st a Section 4 rate proceeding, general rate proceeding, would happen, where the discounted cash flow analysis would occur and a just and reasonable recourse rate would be determined that if you didn't, if you chose not to take a negotiated rate, you would get that rate for the term of your, for your 20 years or 25 years, whatever your contract is. Let me ask you the question I asked your friend. If we ruled against you, if we thought that somehow it was inappropriate to use this recourse rate, what would happen next? What would happen next is nothing regarding the negotiated rate because in this proceeding, because that's already happening in the negotiated rate proceeding. So there were three negotiated rate proceedings after... Does PERC lack the authority to go back and say you need to negotiate new rates in light of the proper recourse rate? Why isn't that what would happen next? Because the negotiated rate proceeding is just a separate proceeding. People certainly in the Atlantic Sunrise negotiated rate proceedings is still ongoing and it's on rehearing and so that's a different circumstance. We don't know what will happen in the end regarding that. North Carolina and New York commissions did not intervene or protest the Dalton expansion or... I think you're getting a redressability issue. If your opponents prevail, you argued that nothing would change, right? They have the negotiated rates. That's a done deal. And I guess I don't understand that. I don't understand why it is that the negotiated rates are a done deal and can't be adjusted in light of a new recourse rate. Because the commission didn't approve the negotiated rates in this proceeding and what the court has jurisdiction over here is the recourse rate, not the negotiated rate. And as Judge Garland, I believe, was saying, there can be an appeal of the negotiated rate proceeding in Atlantic Sunrise, not regarding Dalton expansion in Virginia Southside because the state commissions didn't intervene or protest those negotiated rates. So in their briefs, the petitioners or the intervener for petitioners cite Morgan Stanley, the Supreme Court case for this proposition that FERC has the authority to set aside the contract. And in that case, the court said, you know, where there is unfair dealing at the contract formation stage, then you can set aside the contract. So why isn't that fundamentally what's at issue here? We assume that they were to prevail on the merits of showing that the recourse rate was improper. I guess I'm not fully understanding your question. Again, there's separate negotiated rate proceedings. For expressibility, you're saying that, well, the only thing before us is the recourse rate. And so even if we set it aside, nothing happens with respect to the negotiated rates. And I guess I'm questioning the premise of that. They're questioning the premise of it by citing Morgan Stanley. Because while the commission theoretically in these separate proceedings could set aside, the commission could, I guess, initiate a Section 5 proceeding, sui sante and initiate a Section 5 proceeding to look at those contracts again. The state commissions could file a Section 5 complaint with the commission asking it to relook at those contracts. That could happen. But, again, that's not part of this proceeding here. I'm on the same, stuck a little bit on the same. So the precedent agreements say negotiations, negotiated rates don't go forward until the certificate of convenience and necessity is issued by FERC, correct? I don't know what the, I don't know what the. That's what was represented in the briefs. I just know that they wouldn't, they couldn't be in effect until the, none of the negotiated rates, and certainly in the negotiated rate proceedings, none of the rates are in effect until the projects are in service. So the projects would have to be in service. And they can't be in service without Section 7 and go forward without a certificate. Right. Correct? Okay. So if we vacated the certificate, they couldn't go forward, right? That's true. Okay. And under E, the commission has the power to attach to the issuance of the certificate and the exercise of the rights granted such reasonable terms and conditions as the public convenience and necessity may require, right? Right. So that could include setting a new recourse rate and requiring new negotiation based on the new recourse rate. For sure, the commission could set a new recourse rate, absolutely. And at the very least, then, they could take the recourse rate or it could also, as a condition, require a new negotiation or a new decision. I don't know whether they could do that, Your Honor. And I'm hearing that you're not perhaps buying redressability. So perhaps can I spend a minute on injury? If you have nothing more to say on redressability. Well, I mean, I don't know what else to say other than it's, I see these as two separate proceedings. I think that that's something that would be in the commission's discretion to do. The commission doesn't have to do it. I don't think it would make it more likely that the commission would do that because there are these separate proceedings. Is the commission arguing collateral estoppel as was recommended by your friends on the other side? No, we're not. So you're saying that in these other proceedings, the petitioners could challenge the recourse rate, and then if they were to prevail, then they could use that to argue for a renegotiation or for the vacature of the negotiator? Absolutely. The commission's policy and what has occurred in the Atlantic Sunrise negotiated rate proceeding is that parties can raise anything that they want to in order to challenge the negotiated rate in the negotiated rate proceeding, and that's occurred. These state commissions did, in the Atlantic Sunrise case, argue the same arguments that it made in this proceeding, and the commission has addressed those, and they're, again, now pending on rehearing. Actually, the North Carolina Commission protested the Atlantic Sunrise proceeding. The New York Commission intervened but didn't actually file a protest, but now they both have sought a hearing from the commission. One more law question. On these Section 4 proceedings, if a lower rate is determined, are there refunds available? Absolutely, and the commission has made them subject to refund. Go ahead. So if I could just spend a minute on injury, no injury in fact, and the point there is that each and every one of the bases on which the state commissions argue that they have standing here, that they have been injured, is based on the speculation regarding the future actions of third parties, and this court has time and again, including in Kansas Corporation Commission, determined that that is not sufficient, and that is all they're relying on here. There is no basis to believe that there's a substantial probability that the gas will blow. Which is the problem that you think is speculative? Which step is speculative? So, for example, with the New York Commission, the New York Commission, they argue that it would require three steps to occur. And, of course, in FERC's opening brief, in our brief, we acknowledge that there's a secondary market possibility, but it's just simply a possibility. I guess there would have to be capacity available for that. Well, the question is whether there's substantial probability or whether it's pure speculation. Why is it that Transco would be advertising in the attached advertisements to the reply brief, Why Transco Firm Service? One of the reasons, additional secondary rights in Zone 6. Sure. And at the end, secondary rights within Zone 6 that provide access to the New York market. Sure. That sounds like they are suggesting to the shippers that this is a good deal because you get access to the New York market. Right. Now, if it's just purely speculative, they wouldn't be doing that. So that doesn't strike me as speculative. It's, again, well, so what it requires, first of all, that was in the open season materials here. It was in the what? In the open season materials for the Atlantic Sunrise Project. They were letting them know all the possible things that could occur. And then when they made the application to be filed, they said, the increased demand that we have is in the Mid-Atlantic and the Southeast. It's not in New York. New York's not considered the Mid-Atlantic? No, New York is the Northeast. They said specifically it's not in New York? No, they say in the Mid-Atlantic and Southeast. There's no indication on this record that there is any increased demand. And the Commission made a determination that the capacity is needed for growing demand in the Mid-Atlantic and Southeast. I mean, it doesn't say my next part, which is not in New York, but not in the Northeast. North Carolina isn't in the Mid-Atlantic or the Southeast? North Carolina is, Your Honor. That's right. But, for example, what the secondary marketing would require is that the shippers, that's assuming that shippers will put their capacity into the secondary market. It assumes that other shippers will take that capacity, and finally that other shippers will take that capacity and use it to ship to New York or to North Carolina. But the affidavit explains the reason is that gas can be sold for higher prices in a major consumer area like New York City, and that's the reason, as compared to Pennsylvania, for example, where the price of gas is relatively low. Well, that makes it possible. I will concede that it's possible, but it is not substantially likely. I understand that. We've said that where economics suggests the way in which prices will go, that's sufficient for our cases, and this is an obvious piece of economics supported by an expert affidavit. So I don't understand why it seems obvious that if they're going to pay more in New York than they're going to pay in Pennsylvania, shippers will be happy to use the secondary market. That's, again, theoretically possible. But my understanding is that that's not sufficient under this Court's precedent. So our cases that say we will follow economic analysis, we should reverse? We said with respect to standing that if you come up with an argument that fits the laws of economics, that that's sufficient for standing. So we shouldn't be following that here? Well, I think that what it is is it's just, for example, in Kansas Corporation Commission, where this Court said that there's no standing where the alleged harm rests upon hypothetical chain of events, none of which is certain to occur. Sounds to me quite stronger than... Than the substantial probability test set by the Supreme Court? No, but that's a pretty good standard, and what they've presented, in my mind, doesn't rise to that. But, again, I just want to emphasize, again, that the necessary, on the merits, that the necessary check on the potential mark of power was provided here because the shippers knew when they chose to take service under negotiated rates instead of under the recourse rates that would be set in this proceeding, that they could opt to take service under the recourse rates, which would initially be set in the Section 7 proceeding and would then be subject to Section 4, Just and Reasonable Review, in Transpose, August 2018, General Section 4 rate proceeding. This is not a circumstance where shippers were saying, oh, my goodness, we will have to, we'll be stuck with that terrible, theoretically terrible, recourse rate. We're going to have a Section 4 proceeding available that will absolutely occur shortly thereafter, and we can take that recourse rate. Instead, we'll know we'll have Just and Reasonable Review. So that makes this case somewhat different than another case? Absolutely. And the reason for the August proceeding coming up because of some settlement? They had a settlement, and so, yeah, it was publicly noticed that they were required, that transfer was required to do a General Section 4. So you're not saying that that has to always be the case? Absolutely not. You're just saying that we can resolve this case that way? Exactly, Your Honor. There is nothing further? Thank you. May it please the Court? My name is Andrew Swears. I'm arguing here for Transco. I think I want to cut through what I think is some confusion here. When FERC precedent says that there needs to be a recourse rate available, that's exactly what FERC means. What checks the market power of market participants on a pipeline like Transco is the availability of a recourse rate when pipeline shippers negotiate their rates. That can't be right, and the recourse rate has to be rational. It can't just be anything. And the argument here is that this was irrational. It was old. It was stale. It meant nothing. The shippers on any pipeline, but particularly Transco, are very sophisticated. They're going to be calculating when they engage in negotiation for rates. They are going to be calculating what the rate is, what they believe the proper rate is today, tomorrow. These are 20 years. Without regard to the recourse rate? Is that where you're headed with that? Well, the reason why the recourse rate, the availability of the recourse rate, checks market power is because the shippers know when they enter into that negotiation, it's not negotiate or else. They do not have to take whatever the result of that negotiation provides. What FERC is required to do is to provide a recourse rate for substantially similar service. And that was done here. And as long as shippers can go- But that's the argument that that wasn't done here, that the recourse rate that was chosen had no relationship to current market conditions, and so it was toothless. Well, but at the negotiation stage, the recourse rate is always an estimate. And Section 7, we know from TACO and its progeny that- But I think the argument here is that this was a particularly bad estimate. Is that right? What I'm saying is it's the assurance that the shipper has that there will be a recourse rate set by FERC that checks the market power, because that means that the negotiation is not as thick as- What I'm getting at is what if you have an assurance that FERC will set a recourse rate, but it's an irrational recourse rate? How does that work? Well, the shippers- And I know your argument is that this was not an irrational- Yeah. Recourse rate is an argument that it is. Well, at the time of the negotiation, as FERC counsel discussed, there is no set recourse rate. It's an estimate. They're provided with an estimate of the recourse rate. Your client proposed a rate. We proposed based on an estimate. Now, at the time that these negotiations are going on, we don't know the final cost of this project. It's before the project is even built. So, there's a lot of rough cut justice in these negotiated rates. Help me understand how the negotiation takes place, because maybe that's part of the disconnect here. So, when it's said in the record that Transco proposed the rate, there's some sort of an estimated rate that's based on this pre-tax rate of return. Correct. But that recourse rate is not necessarily accepted by any of the shippers, that specific rate that your client proposed. Right. I mean, FERC could have entirely rejected the recourse rate in the certificate order, but the parties will, the shippers who negotiated rates will still have negotiated their rates. These shippers engage in negotiated rate negotiations because what they're looking for is long-term certainty. Over the 20 to 25-year term of a contract, that recourse rate is going to go up and down, depending on what Section 4 cases are filed, what Section 5 cases are filed. So, you're saying it doesn't make any difference what the recourse rate was at the time? What I'm saying is that FERC fulfilled its obligation under its own policy to check market power by assuring that there was a recourse rate available to be paid. But they accepted for purposes of the Section 7 proceeding a 2002 recourse rate, right? Well, the recourse rate is not entirely, it's a 2002 pre-tax return. The rest of the, there's other elements in the recourse rate there. I'm going to use that just as a shorthand because that's what we're talking about. They accepted that, right? They said that was okay because we have a policy and even if it's old, it's just, it's the most recent. They did accept that and the reason is because if, it would be an understatement to say that setting rates of return and pre-tax returns at FERC is a contentious process. This is among the most contentious of rate issues and now in 2002, I don't know what recourse rates were but interest rates were enormously higher than they are today. Ten-year bond rates were enormously higher than they are today. And imagine that this recourse rate, this rate had not been reset since the days of Jimmy Carter when the rate was probably enormously higher than the very low rates are today. You would say that's still okay? That's still rational just because it provides for a quicker, more convenient proceeding? Imagine it was set at 2 million percent. That would still be okay because there was something, there must be some rate at which it's not rational, don't you think? I suppose there could be but... And as to which it provides no effect, no control over market power. Isn't the whole theory that FERC is employing here, the policy that you have to have a recourse rate in order to constrain market power? The salient point is, let's say that they use a 2 million percent pre-tax rate of return. The shippers don't have to take that. But then they're stuck with negotiation with a pipeline that has market power. And the whole theory was that the recourse rates are supposed to constrain it. If you set a recourse rate that is out of this world and therefore can't constrain it, then you are resting completely on the market power of the pipeline, which FERC said it shouldn't do. Well, we don't concede in this proceeding that Transco has market power. They're smiling, but that's certainly what FERC assumes. Otherwise, you wouldn't need a recourse rate. And I don't remember an argument in FERC's order that we don't have to worry about the recourse rate because Transco doesn't have market power. FERC did not rest its order on that particular issue. But what FERC did say is that the availability of the recourse rate checks the market power. And FERC said it again in the order that we filed on November 20th. And it's irrational to say that regardless of what the recourse rate is. In which case, what's the point of having a recourse rate? Well, if there is an unreasonable recourse rate and shippers decide they can't negotiate anything better, I find it speculative to believe that the pipeline would persist in those negotiations if, you know, at 2 million percent. But nonetheless. It seems to me that, help me understand the way that this works. It seems to me that what you're saying is that at the time that Transco sits down with the shippers to start this negotiation process, they say, we believe or we propose that the recourse rate would be, let's say, 15 percent. The shippers may or may not agree with that. It doesn't really matter whether they agree with it because the recourse rate isn't really set unilaterally by Transco. It's set by FERC. That's correct, John. And so you're saying that when you sit down and negotiate at this beginning to set this kind of precedent rate, you know, you might propose that it's 15 percent. The shippers might think that it's 10 percent. But it doesn't matter if the two sides can negotiate something that they agree on, especially with long term and interest rates might go up and down, markets might go up and down, and they agree at 8 percent that everybody's happy. Absolutely. I mean, if Transco proposes an utterly absurd rate, no shippers are going to agree to take service under it, and facilities won't get built. So, you know, what's going on here is that the shippers are trying to negotiate long term certainty. You know, on one of these projects, I believe it was nine shippers came in and negotiated rates. You know, they're projecting what is in their economic interest over, I think those were 20-year, 15-year contracts with a five-year renewable clause. So they're projecting over a long period of time. Over that period of time, Transco may come in for multiple Section 4 rate cases. That recourse rate is going to go up and down based on current economic conditions. I can tell you today that if we set a pre-tax return today, it's not going to be the same. Well, that gets into an evidentiary issue about the DCF that's in your community. It's not going to be the same as what they predicted. Are you saying the recourse rate for the Section 7 doesn't really matter because it can get fixed later? Is that the point? I'm not saying it doesn't. I'm saying what matters is not the absolute level of the recourse rate. It's the assurance that the shippers have when they enter into negotiations. Not necessarily in the Section 7 proceeding, but in the Section 4 proceedings, is that what you're saying? I'm saying in a Section 7 context when new facilities are being built, so there's a certificate process ongoing, shippers are negotiating and the pipeline needs those shippers because if there's no need, if the pipeline can't demonstrate that there's shippers willing to take service on its pipeline, then the pipeline won't get built. So there is a limit on the 2 million percent recourse rate. Because nobody's going to take service at that rate. The shippers themselves are very sophisticated. These are not small planners. They project what TRANSCO's rates are. If they thought that the 15.34 percent that TRANSCO was using here pursuant to FERC precedent, they could negotiate for something less. This is all said as if you had no market power, and it would be fine if that were the case. But FERC is saying in their policy agreements that that can't be the way in which this is done with a shipper who has market power. Now, I appreciate you're saying that you don't know whether you have market power or not. But for purposes of this, we have to assume that you do, because FERC certainly is not resting its orders on an absence of market power. So in the absence of market power, of course somebody can negotiate between long-term contracts and short-term contracts. And, of course, they get bound by whichever choice they make. But FERC's theory is, which has substantial support in economics, that if the buyer or the seller has market power, then this is not a free choice by the buyer. That's why they have constraint. So all the things you keep saying, you have to explain to us why it's still okay given market power, not it's still okay because it was a completely free choice. Well, so if the shipper can't negotiate a rate due to market power and must take the recourse rate because for some reason it absolutely needs to have service on this proposed project, Well, it's the other way around. Because they don't have in front of them a recourse rate that's a reasonable deal, they have to take the market power negotiated rate, the rate that you're able to extract because you have market power. It's not evil or not evil, this is just economics. I mean, I would say that they're not forced to negotiate. And if they feel like they're getting a raw deal in the negotiation, they can take the recourse rate. And when FERC sets that rate, if they don't like what FERC sets, they can challenge it under Section 5. Right now, in this particular case, there is an ongoing Section 4 case in which the recourse rate is at issue. They can participate there. This is the Section 4 case that TRANSCO was required to file by August 31st? Yes. So at the time of the negotiation, let's say that TRANSCO says, we believe that you should pay us at least 15 cents per unit for the use of our pipeline. And we think that that's fair because we think that the recourse rate that FERC would set would also be 15 cents per unit. So just, you know, we think that that's a fair offer. And they take that. The shippers take that. Okay. And then the recourse rate is set at 12 cents per unit at the Section 7 stage. Okay. What happens there? The shippers stop, or can the shippers say, well, our rate is not just reasonable that we negotiated, and we'd like to have the recourse rate now since it's 12 cents rather than 15 cents? If they negotiate a rate, they enter into a contract for a period of years, I think in cases that range from 15 to 25, and that is the rate they pay. And the reason why they're doing it, Your Honor, is because they believe it's in their long-term economic interest to do that because the Section 4 rate that is set could be higher or lower in 2018. TRANSCO could file another rate case in 2020. Economic conditions could be completely different. The rate could shoot up. Another shipper who is not under a negotiated contract could file a Section 5 proceeding, challenging TRANSCO's recourse rates, and the rates could change again. These shippers, they're not going to enter into a negotiated rate that they don't believe is in their long-term interest. They just won't shift. And that's why you believe that there's no redressability here? We believe that there's no redressability here because they've negotiated their long-term rates. Let's get to what Judge Griffith was pressing on earlier. If you were to remand this back to FERC, presumably what you'd be telling FERC to do is to set a rate of return. So what would have to happen is that FERC would need to engage in all of its processes, all of the contentiousness that is involved in setting a rate of return. But your opponent suggested that could be done on an expedited basis. I'm sure that's his opinion. I don't believe that can be done on an expedited basis. FERC has a DCF policy that turns into a battle of experts. In order to set a pre-tax return, you have to set the rate of return, which uses a discounted cash flow analysis. FERC has just issued a recent case several weeks ago, questioning whether that will be the only analysis involved or whether other models need to be used going forward. That's in the electric field. It could be applied to the gas field. People always fight over bond ratings. The proxy group has certain exceptions for removal of people from the proxy group. That is always a battle. There's a case right now, an EMRA main case, that was filed in 2011. The sole issue is the rate of return, and it is still ongoing. It's been before this court. It's now back at FERC, and proceedings are scheduled through 2019. So, if you remain in this case, what you're saying is you need to set a rate at the Section 7 stage. That tells pipelines like my client that there's going to be a lot of delay because we can't rely on what we're negotiating with our shippers. There's no question this infrastructure was needed. Nobody's challenged the need for these projects. And what CATCO says is that FERC can consider the rate, and FERC can also consider the need and other non-cost factors. And what FERC is saying is these facilities are needed. There's a market in Florida and Alabama for this gas, and that's why Atlantic Sunrise is being built. And in order to put that into service, to serve the public interest, we're going to have some rough cut justice because the Section 7 rate is an estimate. It's not just the rate of return factor, the pre-tax return that's an estimate in the Section 7 rate. It's all of the costs. So when a shipper is negotiating at that stage, they're negotiating based on what TRANSCO thinks the project will cost. If there's a cost overrun and it's not covered in the rate they negotiated, TRANSCO eats that, even though it may be factored into the recourse rate later. So that is the process that I believe CATCO recognizes, and that is what I understand FERC to be arguing here is that, you know, what checks the market power is the availability of the recourse rate. Can I ask you, I'm reading from the 1996 policy, my FERC, it says, The Commission is particularly concerned about maintaining the integrity of the recourse service. In order to be successful, the recourse service must remain a viable alternative to negotiated service. Otherwise, if the recourse service remains stagnant, in time the recourse service will become outmoded and will cease to be a viable alternative to negotiated service. Since the purpose of the recourse service is to act as a check against pipeline market power, such a result is impermissible. So how is that consistent with allowing a 15-year-old recourse rate to be the only check on market power? I think, Your Honor, what they're saying there is that the recourse service is the service. So if I'm a shipper and I'm contracting to ship from A to B, I can negotiate a rate for that. If there's no service available at a recourse rate that can get me from A to B, there's no comparable service. And then I have the gun to my head that Your Honor is concerned about. I understand the recourse service will be outmoded. So what you're saying is recourse service is not the same thing as recourse rate. I don't believe that that should be read to include the actual rate for the service. It is the service itself. If I'm negotiating a rate from A to B, there must be comparable service at a recourse rate from A to B. Otherwise, I must take the negotiated rate. And I'll go off to three paragraphs where it says, thus, the recourse rate mitigates market power. It's the availability of the rate. The fact that Herb will set a rate. They say it's the rate that mitigates the market power, not the availability of the service. It could be at any rate. It's the availability of a service at a recourse rate. Right. So is it not talking about the problem that will occur if it gets outmoded, the rate that becomes outmoded, because it doesn't reflect actual economic conditions? This would seem to me a lot different case. It's a five-year-old rate, maybe even a ten-year-old rate. But we're talking about such different economic conditions in the country now than they were in 2002. But we have no showing that those conditions, whatever they may be, would lead to a different pre-tax return. That gets to a different issue. Well, they have two different pieces, agreed not sufficient to establish it, but the only question, one is their cash flow analysis, and the other filed other cases around this time. They only need enough to show why they need a hearing, not enough to prove their case. True, but the discounted cash flow analysis that they submitted, they called it a preliminary discounted cash flow analysis. That's not the same. What comes out of there is an after-tax rate of return. That is only one element of the pre-tax return calculation. There are other factors they can interact with. I understand, but that's not what FERC said in this order. FERC just said we have a policy and we're going to stick with it. They didn't say there was anything wrong with the evidence-preserving. They just said we have a policy and we're going to stick with it. Well, because FERC knows that nobody is paying this recourse rate, because everybody has entered into negotiated rate contracts, and they know that the recourse rate will be set in this case or on these expansions in the proceeding that was required to be filed on August 31, 2018. That proceeding has been filed, and they know that- What rate did you suggest in that proceeding? There's a variety of rates. I'm the one that's being drawn into question in this case. What pre-tax rate did you suggest? I'm not sure what the overall pre-tax- I think it was lower than the 15-year-old one. Your Honor, I could get that for you, but I'm not sure it's standing here today. I can tell you that the rate of return on equity is- 16.4%. The rate of return on equity is 16.04%, which is higher than 0.044. I'm just reading from the FERC order. Oh. Perhaps my memory is transposing those two numbers, but nonetheless, it's higher than the rate of return. So, if we're comparing apples to apples and not apples to oranges, which they recognize they're doing, if we're comparing apples to apples, today's conditions give you an even higher rate of return than what they're trying to use as evidence to argue the point. Well, either that or Transco would like to make more money than it made in the past. This wasn't a resolution by FERC that you're correct. Sure. That's what you put in. Nor do we have any assurance that their calculation is correct. That's why I say that these calculations become real battles at FERC because everybody brings in their experts. You know, people have incentives to try to come out with different things, and FERC has to sort through all that, and it's an extremely time-consuming process. Go ahead. Well, I understand my red light is on. 22 minutes. Yes, unfortunately. I did want to speak to the additional evidence that was provided on reply by New York about the open season brochure. Yeah. Go ahead. Yes. Okay. The way this works is Transco shippers are contracting for service, for example, on Atlantic Sunrise. They're contracting from Pennsylvania all the way down to Alabama and Florida. They're paying a reservation rate for that entire length of service. They wouldn't be doing that if they didn't think their primary market was in Florida and Alabama. And I might add that one of the reasons they're doing that is because they're trying to access the world LNG market, which has extremely high prices. None of that is in the record. None of that's in the record, nor, I mean, they submitted it on reply. We didn't really have an opportunity to address it, and the statements are the bare statements of an individual who works at the New York Public Service Commission, so there's not a whole lot of substance supporting them. But if... No disrespect. No disrespect. I mean, we're all pressing our point here. So, if, as FERC Council has said, a shipper, let's say it's Anadarko, it's one of the shippers on the Atlantic Sunrise project. If they wanted, if for some reason they needed to sell gas in New York City, I can't tell you that they can't do it, but what I can tell you is if that gas is sold in New York City from one of the Atlantic Sunrise shippers, the people in Atlantic City are paying the market price. They are not paying some Atlantic Sunrise price that, you know, includes, necessarily includes the Atlantic Sunrise transportation rate. They are paying whatever the market in New York dictates, right? And there are other pipelines going into New York City. Transco's not the only one. And I might add that Transco has another branch of its pipeline that goes into New York. That's the Leidy line. The rate for service on the Leidy line is different. So, a shipper... Well, what again was the reason for advertising that you can sell in New York? It was simply to state that there's flexibility, and I believe FERC Order 637 requires some of this flexibility. So, you can segment your service, and you can use what's called secondary rights to get into other places. I mean, anybody can ship gas anywhere. There must be something attractive about it or you wouldn't be advertising. Well, it's the ability to flex, you know, into New York if you need to. But they're not... What it doesn't say is that you get any discount on your Atlantic Sunrise reservation charge if you do that. If you do that, you're still paying the entire Atlantic Sunrise charge. Well, your costs will be higher. And so, in a free market, costs will be part of a supply curve. You will face a demand curve. It's not just a market price. The market price is determined by the crossing of the supply and the demand curves. So, it's going to increase the price in New York. Well, that assumes they can even get that gas into New York on days where there are peak days where there's a lot of competition for the price. And what I would say there is that on a peak day in New York, you're not going to get secondary service in New York City. But shouldn't there have been a footnote to the advertisement saying, ignore the man behind the screen? This is actually not true. I think transgress shippers understand exactly what that means. Okay. All right. Further questions? Thank you. Thank you, Your Honor. Is there any time left? Okay. So, in the absence of time, I only have one question, which I'd like both of you to answer, not both of you to answer, which is what about this argument that the shippers knew made by Brook Council that in this particular case, not necessarily in all cases, but in this particular case, they knew that they would have this August proceeding coming up and that they could opt to take whatever recourse rate is then set in what you would regard as a fair proceeding? Your Honor, as you noted, the negotiated rate policy statement, alternative rates policy statement requires that the rate be available at the time that the negotiations are being entered into. The argument is that the level doesn't matter, it makes it difficult to assume that there is a lack of market power. And the fact that parties chose to enter into these agreements can't be relied upon, as you explained in your Missouri Public Service Commission case, that must first determine upon the basis of substantial evidence that the pipeline lacks significant market power before they can rely on those agreements. And may I please just address the speculative nature of statements? There were a couple of statements made about the record. I'd just like to prescribe a couple of sites for the record. Judge Wilkinson asked what the most recent financial data was. Actually, if you look at Joint Clinics at 53, the most recent financial data was provided by the state agencies. FERC counsel also stated that the precedent agreements were not before it. In fact, if you look at Joint Appendix at 13, 164, and 229, the precedent agreements were provided to FERC. They were provided under SEAL, but FERC certainly had those precedent agreements before it at the time it was making the determinations here. And as to the speculation, I'd like to bring the Court's attention to Joint Appendix at 296, where in the order below, FERC stated, as we have previously stated, a project driven primarily by marketers and producers does not render it speculative. Marketers or producers who subscribe to firm capacity on a proposed project on a long-term basis presumably have made a positive assessment of the potential selling gap to end users in a given market and have made a business decision to subscribe capacity on the basis of that assessment. Here, TRANSCO designed its project to meet the growing demand for natural gas in the Mid-Atlantic and Southeastern markets. That's North Carolina, and that's affirmed by the next paragraph there it is as well. I thank you for your attention. Judge Garland, if I understand your question, you're asking about the upcoming rate case? Yes, and the particular argument made by FERC counsel that we don't have to decide everything. Here, about the future, we only have to decide that in this case, somewhat idiosyncratic, because the Section 4 proceeding was coming up, and that New York consumers would get the benefit in the sense of refunds if a lower rate would have been decided. So when this particular deal was negotiated, it was negotiated in the shadow of a, maybe at that moment, too high rate, but one which you had some prospect with the shippers that would go down in Section 4 and that they would get the benefit through a refund. Sure. And that controlled the market power here, and it's under those understandings that they took the negotiations. Sure. So however, whatever the reasoning of what you just said, I think it, you know, whether it's logical in some sort of abstract sense, it certainly doesn't comply with the statutory obligation to protect consumers from market power in Section 7 proceedings. So I think that's what you just said fits with what I just said, and I don't think that's allowed under the NAFTA Act. If the normal rule, which there's not a challenge to, which is we use the old rate, your challenge is particularly about this really, really old rate. You're not challenging the whole policy of, am I right? No, not in every circumstance. There may be circumstances where it's appropriate and rational to abide by the policy. So her argument is that in this case it was appropriate even so to not change it immediately in the Section 7 proceeding, but to know it was coming in the next proceeding, and under those circumstances they knew that they were negotiating in the shadow of what would be a decent cost of service. So I think the answer is that the rate proceeding could take years. They would be subject to those inflated recourse rates with no certainty, and then I think related to that is how that fact is going to affect sophisticated negotiations between parties, and that it's likely to dissuade them that if they know that FERC is going to use an irrationally high initial recourse rate, adopt one in a Section 7 proceeding, that that's going to affect the negotiations and it's going to allow Transco to exercise the market power that the National Gas Act presumes. So I'd like to take, I think, one or both of my colleagues' questions. If we were to, what would we do here? That is, what would FERC do if you had your way? So FERC has options, and, you know, they've certainly used this as a sword that we suggested in an evidentiary proceeding at one point, but we're trying to recognize that FERC can take rational action to pursue its consumer protection obligation in terms of market power. So we don't want to dictate that, but we think there are mechanisms, you know, including an evidentiary proceeding that's an option, but, you know, I think you're honing in on redressability and traceability again, and I believe that when FERC was up here that it said that it had the discretion in certificate proceedings to renew the recourse rate and vacate the negotiated agreements. And if that's what FERC has said, I mean, traceability and redressability are done. If they had that discretion and they did not exercise it in our favor, then we are certainly harmed. What would you, if you had your way on the merits, what would they do? They would set a new recourse rate and the shippers could... Renegotiate that. ...they would have to renegotiate the deal. Yes. No longer in the situation where the pipeline power or the market power that the Natural Gas Act presumes could be acting because in those circumstances FERC would be satisfying its policy that recourse rates need to remain integrity and not become outmoded. And when those situations exist, that is how FERC has... How would this new recourse rate proceeding take less time than the Section 401 that's already begun? So, I mean, again, I would in some ways leave that to FERC's rational exercise of discretion, how it goes about doing this. FERC certainly has shown flexibility in other instances. And the more fundamental answer is administrative convenience is never an answer for why you do not have to fulfill your statutory duty. So there are tradeoffs in many areas, but the tradeoff cannot be we have these statutory duties, you know, to allow for abundant supply and we have to protect consumers from market power. And, you know, for reasons of administrative convenience, we're only going to fulfill one of those duties. We're not going to do the consumer production again. How do you do both of those statutory requirements? You... I think the answer is the puzzle. Yes, but how do you do that in a shorter amount of time than it happens in the Section 404? I mean, I think a paper hearing, I just think that there's certainly a lot of flexibility that FERC would have to, in terms of its exercising its discretion, you know, to come up with some compromise. Again, you can compromise between the need to bring these projects into service due to the fact of FERC's other obligations, but you can't... You know, it has to be... It has some rational explanation for how it's also fulfilling its consumer production obligation in terms of protecting them against market power. It's about offering a solution, but I am saying... But I am arguing that the Natural Gas Act demands one. The president of the Supreme Court in this court demands one in terms of specifically saying that Section 7 is a regime where you do need to protect against market power. So the answer is we won't do that now. We'll do it later in the general rate case. It's not a legally permissible default answer. Your redressability argument seems to me to be counterfactual. Ah. So in 2014, there's a negotiation between Transco and Schiffers, and let's suppose Transco says, we believe that you should pay us 15 cents per unit for the right to use our pipeline, and we'll give you that price over 20 years. You know, we think it's fair because the recourse rate that FERC would set today, if there were a Section 7 proceeding, would be 15 cents, based on what our, you know, discount rate of return would be, et cetera, et cetera. Schiffers could say, that's hogwash. We think that FERC would set the recourse rate at 10 cents, and we think that your 15 cents number is ridiculous. We're not going to accept that as a negotiated rate, and we'll take our chances and just accept whatever the recourse rate is that FERC sets, but they didn't do that here. They agreed to a negotiated rate, and now that it's been agreed to, even if at this stage we were to say that that recourse rate that had been proposed by Transco was, you know, not just and reasonable, it doesn't change the fact that at the time, I mean, the Schiffers didn't know that FERC was going to accept that rate or not. They could have taken their chances. They didn't want to take their chances. They were satisfied with what the outcome of their negotiations were. So why is it that even if we find that the recourse rate that was proposed in the negotiations was too high and that FERC shouldn't have approved it, that that means that we go back and unscramble to say? So the answer to that is that at the time of the negotiations, all of these sophisticated parties would have known about FERC's policy, and I think what FERC is advertising repeatedly, you know, and emphasizing is that it consistently applies its policy. It believes that's a defense that it consistently applies its policy. But, of course, that led Schiffers to know when they were negotiating this rate that they were extremely unlikely to be able to get FERC to move off that position, and so I believe that's the answer to that question. So they knew in 2014 that when Transco proposes 15 cents, it's based on my hypothetical, but based on the policy that FERC would buy that lock, stock, and barrel? Yeah. How would they know that? Because FERC has projected that it will consistently apply this policy, and, you know, so you're a sophisticated shipper sitting there, you know, thinking about that issue, and the question is whether you will pay, you know, so you know, you know, assuming an irrational degree in terms of that rate of return, the shippers will pay up until that in terms of the negotiated rate to avoid being subjected to that irrationally high rate of initial recourse rate. All right. We'll take a matter of submission. Thank you very much. Thank you. We appreciate your help.
judges: Garland, Griffith, Wilkins